**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| PHT CORPORATION, | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 04-60 (GMS) |
| | ) | |
| INVIVODATA, INC., | ) | |
| Defendant. | ) | |
| —————————————————— | | |
| PHT CORPORATION, | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 04-61 (GMS) |
| | ) | |
| CRF, INC., | ) | |
| Defendant. | ) | |
| —————————————————— | | |
| PHT CORPORATION, | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 04-821 (GMS) |
| | ) | |
| ETRIALS WORLDWIDE, INC. | ) | |
| Defendant. | ) | |

**DEFENDANTS' OPENING *MARKMAN* BRIEF**

MORRIS, NICHOLS, ARSHT & TUNNELL
Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 N. Market Street, P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200

Attorneys for Defendant eTrials

POTTER, ANDERSON & CORROON LLP
Richard L. Horowitz (#2246)
David E. Moore (#3983)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19899
(302) 984-6000

March 11, 2005                    Attorneys for Defendants invivodata and CRF

# TABLE OF CONTENTS

**Page**

I.    NATURE AND STAGE OF THE PROCEEDING.................................................. 1

II.   SUMMARY OF ARGUMENT .......................................................................... 1

III.  STATEMENT OF FACTS ............................................................................... 3

    A.  The Patent Specification......................................................................4

    B.  The Asserted Claims ...........................................................................7

    C.  The Prosecution History ......................................................................8

IV.   ARGUMENT.................................................................................................. 12

    A.  The Law Of Claim Construction .......................................................12

        1.  The Claims Should Be Construed In Light Of The
            Intrinsic Evidence.................................................................12

        2.  A Claim Construction Proceeding Is Not An Excuse
            For The Patentee To Rewrite Its Claims.................................14

    B.  The Proper Construction of the Disputed Terms .................................15

        1.  Independent Claim 22.................................................................16

            a.  The "Connecting Directly" Limitation ........................16

            b.  The "Part Of A Single, Unified Portable Unit" Limitation ..........19

            c.  The "Subjective Data" Limitation ...............................22

        2.  Independent Claim 34.................................................................23

            a.  The "Of The Portable Unit" Limitation ......................23

            b.  The "Digital Data Network" Limitation ......................27

         3.  Dependent Claims 29-30 .............................................................30

            a.  The "Digitized . . . Writing" Limitations ....................30

        4.  Dependent Claim 36.................................................................32

            a.  The "Public Data Network" Limitation .......................32

        5.  Dependent Claims 38-40 .............................................................33

            a.  The "Connection Device" Limitations..........................33

    C.  The Additional Constructions Sought by PHT ...................................37

        1.  PHT's Constructions Alter The Claim Scope ........................37

        2.  PHT's Constructions Introduce Unnecessary Synonyms .....................38

        3.  PHT's Constructions Complicate Unambiguous
            Claim Language ...................................................................38

V.    CONCLUSION.................................................................................................. 39

# TABLE OF AUTHORITIES

**Page**

### CASES

*Abbott Labs.* v. *Novopharm Ltd.*,
    323 F.3d 1324 (Fed. Cir. 2003) ...............................................................13, 22

*Digital Biometrics, Inc.* v. *Identix, Inc.*,
    149 F.3d 1335 (Fed. Cir. 1998) .........................................................................15

*Elekta Instrument S.A.* v. *O.U.R. Scientific Int'l, Inc.*,
    214 F.3d 1302 (Fed. Cir. 2000) ...................................................................14, 17

*Ethicon Endo-Surgery, Inc.* v. *United States Surgical Corp.*,
    93 F.3d 1572 (Fed. Cir. 1996) .....................................................................13, 21

*Forest Labs, Inc.* v. *Abbott Labs.*,
    239 F.3d 1305 (Fed. Cir. 2001) ...................................................................13, 28

*Interactive Gift Express, Inc.* v. *Compuserve, Inc.*,
    256 F.3d 1323 (Fed. Cir. 2001) ...................................................................12, 38

*Litton Sys., Inc.* v. *Honeywell, Inc.*,
    145 F.3d 1472 (Fed. Cir. 1998) .........................................................................15

*Markman* v. *Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996)................................13

*Rambus Inc.* v. *Infineon Techs. AG*,
    318 F.3d 1081 (Fed. Cir. 2003) .........................................................................12

*Rheox, Inc.* v. *Entact, Inc.*,
    276 F.3d 1319 (Fed. Cir. 2002) .........................................................................14

*Southwall Techs., Inc.* v. *Cardinal IG Co.*,
    54 F.3d 1570 (Fed. Cir. 1995) ...................................................14, 15, 23, 37

*Springs Window Fashions LP* v. *Novo Indus., L.P.*,
    323 F.3d 989 (Fed. Cir. 2003) ...........................................................................15

*Tex. Digital Sys. Inc.* v. *Telegenix Inc.*,
    308 F.3d 1193 (Fed. Cir. 2002) .........................................................................12

*Tex. Instruments Inc.* v. *United States Int'l Trade Comm'n*,
    988 F.2d 1165 (Fed. Cir. 1993) .........................................................................13

*United States Surgical Corp.* v. *Ethicon, Inc.*,
    103 F.3d 1554 (Fed. Cir. 1997) .....................................................................3, 14

*Vitronics Corp.* v. *Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ...................................................................................13, 15

*Vivid Techs. Inc.* v. *Am. Sci. & Eng'g Inc.*,
    200 F.3d 795 (Fed. Cir. 1999) ...................................................................................14, 38

*Warner-Jenkinson Co.* v. *Hilton Davis Chem. Co.*,
    520 U.S. 17 (1997)...........................................................................................................15

*Watts* v. *XL Sys., Inc.*,
    232 F.3d 877 (Fed. Cir. 2000) .........................................................................................13

All **bold, *italics*** emphasis in this brief has been added unless otherwise noted.

I.     **NATURE AND STAGE OF THE PROCEEDING**

These three actions were brought by plaintiff PHT against defendants eTrials, invivodata and CRF for allegedly infringing U.S. Patent No. 6,095,985.  The Court has scheduled a *Markman* hearing on April 19, 2005 for all three actions.  For the Court's convenience, defendants are submitting a single, joint memorandum to explain how the asserted patent claims should properly be construed.

II.    **SUMMARY OF ARGUMENT**

Apparently unhappy with its patent claims as they were issued by the Patent Office, plaintiff PHT asks the Court to construe every limitation of every asserted claim.  For the sixteen asserted claims and the numerous limitations they contain, this translates to an exercise that is manifestly inappropriate because it would effectively rewrite every claim.

In fact, most of the claims and claim limitations do not require construction because they are readily understandable based on their plain language.  The few limitations that should be construed are amenable to construction based on the intrinsic evidence, without resort to expert testimony.

**The '985 Patent.**  The '985 patent relates to a particular system for collecting and recording data about a patient's health.  According to the patent, the patient uses an electronic pen to answer health-related questions that appear on the LCD screen of a handheld device such as an Apple Newton® Message Pad.  A "data logger" included within the handheld unit collects the patient data, and a modem or other "data transmission device" periodically sends the data over a communication network to a remote data storage location, where it can be accessed as needed.  The network may be a telephone network or a digital data network such as the Internet.

**The Proper Construction.**   There are three principal claim construction issues in this case:

- What does it mean for the data transmission device to be "part of a single, unified portable unit" (or alternatively, to be "of the portable unit")?

- What does it mean for the data transmission device to be "capable of connecting directly" to the communication network?

- What is the claimed "digital data network?"

These limitations were not in the claims as originally filed, but were added during prosecution to overcome an obviousness rejection.

In arguing that the added limitations rendered the claims patentable, the applicants told the Patent Office that the patented invention, unlike the prior art, is directed to a "single, unified handheld unit that ***includes an on-board*** communication device, such as a modem." Thus, properly construed, the data transmission device must be "included within" the handheld unit, like the internal modem of one of the disclosed embodiments. The other disclosed embodiment – the external modem of the preferred embodiment – was disclaimed.

The applicants also told the Patent Office that the handheld unit allows "direct access to a communications network ***without requiring connection via a separate unit***, such as a personal computer. . . .   For example, the handheld unit may have a modem that is simply plugged into a telephone jack." Thus, the data transmission device of claim 22 is properly construed to be a device that "can be connected to a communication network without requiring a separate unit (such as a computer or modem) between the data transmission device and the network."

Finally, because the patent expressly differentiates between a telephone network and a data network, the claimed "digital data network" should be construed as "a

network, other than a telephone network, that transmits data digitally rather than in analog form." Defendants' proposed constructions are set forth in the attached Tab 1.

   **PHT's Erroneous Construction.**  Rather than construe the claim language in light of the patent and its prosecution history, PHT attempts to rewrite the claims to try to create infringement where there is none.  PHT's constructions ignore words and entire phrases that appear in the claims.  They also inject concepts that are neither recited in the claims nor supported by the specification or prosecution history.  PHT even purports to "construe" claim language simply by introducing synonyms for no apparent reason.  So sweeping is PHT's rewrite that it extends to every word of every asserted patent claim – a telling admission that those words, as they were issued by the Patent Office, do not cover defendants' accused products.

   The Federal Circuit has rejected PHT's approach to claim construction.  "The *Markman* decisions do not hold that the trial judge must repeat or restate every claim term in order to comply with the ruling that claim construction is for the court. Claim construction is a matter of resolution of disputed meanings and technical scope. . . "  It is not an obligatory exercise in redundancy."  *United States Surgical Corp.* v. *Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).  The defendants and the public are entitled to rely on the public record of the '985 patent – the claim language as issued, the patent specification, and the prosecution history – without having to fear a comprehensive claim rewrite once their products appear on PHT's radar screen.

   For the reasons explained below, the Court should adopt defendants' proposed constructions.

## III.  <u>STATEMENT OF FACTS</u>

   The '985 patent, titled "Health Monitoring System," names Stephen Raymond, Geoffrey Gordon, and Daniel B. Singer as inventors and issued August 1, 2000

from an application filed December 30, 1997. The patent claims priority from U.S. Patent No. 5,778,882, which was filed February 24, 1995. PHT alleges that it is the exclusive licensee of Brigham & Women's Hospital, which applied for and owns the patent.[1]

### A.    The Patent Specification

The '985 patent is directed to a system that "tracks the state of health of a patient" by collecting and recording data about the patient (Abstract).

As shown in Fig. 1 of the patent, the system of the preferred embodiment includes a plurality of health trackers 104 (yellow) and a central database 102 (brown):



**FIGURE 1**
*color annotations added*

Each health tracker has: (a) a data logger 106 (green) that collects "subjective data" about the patient based on questions the patient answers; (b) a monitor 108 that collects objective "physiological data" using EKG electrodes, underarm thermometers, and other sensors attached to the patient's body (Fig. 3, not shown above); and (c) a modem 110 (blue) that transmits both kinds of collected data to the central database 102 (col. 5:16-18). Because all

---

[1]    A copy of the '985 patent is attached as Ex. A of the accompanying Joint Appendix. For brevity, all citations to Ex. A will be in "column:line" format.

of the asserted patent claims require a data logger – and because none requires a monitor – the above graphic and the following discussion focus on the aspects of the patent directed to the data logger.

The data logger collects subjective data by prompting a patient to input data regarding his or her condition (col. 5:33-46).  The patient uses an electronic pen or stylus to answer questions that appear on the LCD screen of a "handheld data input device."  In the preferred embodiment, the data logger is an Apple Newton® Message Pad (Fig. 15; col. 24:10-16), which displays a series of screens designed to elicit information about the patient's condition (*see*, *e.g.*, Fig. 16B and col. 24:51-55).

As data are collected, they are "timestamped and stored in a local memory unit of the data logger" (col. 3:42-47; *see also* col. 26:29-31).  The locally stored data are periodically uploaded to central database 102 "using an associated modem 110, and some combination of a telephone network and a data network" (col. 5:16-25; *see also* col. 26:33-37).

The patent describes two alternatives for uploading the data – one in which the modem dials up to the central database using a direct telephone connection, and another in which the modem dials up to a local network access computer, which then transmits the data to the central database over a data network:

> In the present embodiment, the ***modem 110 directly connects via telephone*** to one of the computers that support the database 102.  ***In the alternative, the modem may connect to a local network access computer*** and transmit data to the database via the network connection.

(col. 5:21-28; emphasis added).  These two different embodiments – one providing a "direct" connection for uploading data from the health tracker to the central database, and the other uploading via a local network access computer – are depicted below:



**Preferred Embodiment**



**Alternate Embodiment**

After the data have been transmitted from the health tracker to the central database, the data can be accessed as needed by a hospital, doctor, or other medical personnel.

Preferably, the modem used to transmit the data to the central database is an "external modem" having a "chargepad for recharging the batteries of the portable monitor 108 and data logger 106 units" (col. 5:8-9, 11-14). The patent specifies two other possibilities for the external modem, one of which applies to the data logger:

> ***In the preferred embodiment an external modem is used*** primarily because of lower cost, however those skilled in the art will recognize that ***it would also be possible*** to include a single chip modem in the monitor 108 or ***to plug a PCMCIA modem into the data logger 106***.

(col. 5:8-11). The patent thus discloses that the modem used with the data logger is either an external modem with a chargepad, or an internal, PCMCIA modem:[2]

---

[2]    A PCMCIA modem is a credit card-sized device that can be inserted into a slot in the handheld unit such that the card is included within the unit. An explanation of how a PCMCIA modem is inserted into an Apple Newton® Message Pad device appears at Defendants' App. A at p. 35. A PCMCIA modem is an internal modem, in contrast to the external modem of the preferred embodiment.


**Preferred Embodiment**


**Alternate Embodiment**

In addition to collecting data from the patient, the data logger can be used by the patient to communicate with a doctor. The patient can use the electronic pen or stylus to create a handwritten note, which is converted into digital data and transmitted to the doctor (Fig. 20A; col. 26:41-55).

**B.     The Asserted Claims**

PHT has asserted sixteen claims – 22-30, 34 and 36-41 – against the three defendants in this case. Claims 22 and 34 are independent claims, while the remaining claims depend from one or another of those two claims. The asserted claims are all directed to a "portable personal health tracker" or "personal health tracking system" having a "data logger." Other, unasserted claims are directed to health trackers and systems that include a "monitoring device" (*e.g.*, claims 1-21 and 31-33).

For the Court's convenience, the defendants' proposed constructions are attached as Tab 1 to this brief. The full text of the asserted claims is reproduced at Tab 2.

C.     **The Prosecution History**

As originally filed in the Patent Office, the application leading to the '985 patent did not include any of the claims asserted in this lawsuit. Those claims were added during prosecution.[3]

In a first Office Action, the Patent Examiner rejected the original claims as obvious in view of U.S. Patent No. 5,128,552 issued to Fang (PHT 497). The basis for the rejection was that Fang discloses a health monitor capable of collecting data about a patient's "psychological condition" and that any additional elements in the applicants' claims would have been obvious to one of skill in the art.

Applicants responded to this rejection by amending the pending claims, adding new claims (the claims now being asserted), and arguing that the amended and new claims were different from Fang (PHT 475-88). After describing "the invention," the applicants added three specific limitations to claim 1, and the claims-in-suit were argued to be patentable over Fang based on a comparison of those claims to claim 1.

In particular, the applicants asserted that, unlike the prior art, their invention included a "single, unified handheld unit that includes an on-board communications device, such as a modem" (PHT 485). The applicants argued that this attribute of the invention permitted a "direct" connection to a communication network without any need for connecting the on-board device to a "computer," "secondary control unit," or other "separate unit":

> ***In contrast to Fang, the present invention*** includes a handheld monitor unit that allows it to be easily carried with a subject. A particularly useful feature in this regard is the construction of the monitor to allow direct access to a communications network ***without requiring connection via a separate unit***, such as a personal computer. That is, the monitor is ***a single, unified handheld unit that includes an on-board communication device, such as a***

[3]     Relevant excerpts of the prosecution history are attached as Exs. B-D of the accompanying Joint Appendix. For brevity, all citations to Exs. B-D will refer to a production number beginning with the prefix "PHT."

*modem.*   Through this communication device, the handheld unit may be *coupled directly to a communication network* to allow direct transmission of collected data to a destination site.  For example, the handheld unit may have a modem that is simply plugged into a telephone jack. . . .  *There is no need for* connecting the device to a *computer or* otherwise transmitting the data via a *secondary control unit*.

(PHT 485; emphasis added).

Consistent with these remarks, applicants added new claim limitations to pending claim 1 (underscoring in original to indicate added language; bold italics emphasis added):

1. *A portable personal health tracker comprising*:

*a* multiparametric physiological *monitoring device* which periodically and automatically measures and records from a subject a plurality of different physiological data pertinent to a plurality of different physiological systems;

*a time base* which tracks the time of recording of the physiological data;

*a data storage unit* in which the physiological data is stored with reference to the time base such as to provide a chronological health history of the subject;

*a data logger* which collects subjective data from the subject regarding the subject's psychological condition and subjectively observed physiological condition; *and*

*a data transmission device* capable of connecting directly to a communication network to allow transmission of data to a destination site from points of access to the network that are remote to the destination site, wherein each of the components of the health tracker is part of a single, unified portable unit that may be used by an ambulatory patient.

(PHT 476).  Applicants explained these amendments as follows:

In order to more clearly highlight the advantages of the present invention, *Claim 1 has been amended in several ways*.  Firstly, the claim has been *limited to a "handheld" tracker*, thereby distinguishing it from those devices which may be movable, but which are not truly ambulatory. . . .

Claim 1 has also been amended to specify that the handheld device includes a *data transmission device that is capable of connecting directly* to a communication network, and that the *components of the health tracker, including the data transmission device, are part of a single, unified handheld unit* that may be used by an ambulatory patient.

(PHT 485-86) (emphasis added).

The applicants thus identified three characteristics distinguishing claim 1 from the prior art:

- The claim is limited to a "handheld" tracker;

- The handheld tracker must include a data transmission device that can connect "directly" to a communication network; and

- The health tracker's components, including the data transmission device, must be part of "a single, unified handheld unit."

These amendments and arguments disclaimed coverage of the preferred embodiment which used an external modem with a chargepad (*see* § III.A. *supra* and col. 5:8-9). An external modem is not part of "a single, unified handheld unit." And interposing an external modem between the handheld unit and the communications network does not "directly connect" the handheld unit to the network. Thus, as a result of applicants' arguments to avoid the Fang prior art, the only disclosed modem embodiment for the data logger that remained within the scope of claim 1 is the alternative embodiment which used an (internal) PCMCIA modem. The following figure illustrates the effect of the foregoing amendments and arguments:



**Preferred Embodiment**
**Disclaimed During Prosecution**



**Alternate Embodiment**

The applicants also "added a number of new claims intended to provide more complete coverage of applicants' invention," including all of the claims now in suit  (PHT 486).  Applicants explained to the Examiner the similarities and differences between claim 1 and the new claims.  For example, application claim 41 (asserted claim 22)[4] was described as having the same "direct" connecting "data transmission device" as claim 1, but omitting the "physiological monitor" of that claim:

> New independent Claim 41 [issued claim 22] is **similar to Claim 1, being limited to** a single, handheld unit having a data transmission device that connects directly to a communication network, **but does not include** the limitation of a physiological monitor.

(PHT 487).  All three characteristics that applicants argued distinguish claim 1 from the prior art (see bulleted text above) thus apply equally to asserted claim 22.

As for asserted claim 34, applicants noted that the claim was "also similar to" claim 1, with two exceptions.  The data transmission device was different and a physiological monitor was not recited:

> New Claim 53 [issued claim 34] is **also similar to Claim 1, but is limited to** a data transmission device that transmits data to a remote storage location via a digital data network.  Also, . . . Claim 53 **is not limited to** a physiological monitor.

(PHT 487).  Instead of "a data transmission device that connects directly to a communication network" recited in claim 1, claim 34 recites "a data transmission device that transmits data to a remote storage location via a digital data network" (PHT 487).

In arguing patentability, the applicants did not identify any other differences between issued claims 1 and 34.  Thus, the first and third distinguishing characteristics (the bulleted text at p. 10, *supra*), apply to claim 34 as well (*i.e.*, the tracker is a single, unified

---

[4]     When the patent was issued, application claims 41-46, 48-49, 53, and 55-60 were renumbered as claims 22-27, 29-30, 34, and 36-41.  Thus application claims 1, 41, and 53 issued as asserted claims 1, 22, and 34.

handheld unit and cannot cover interposing an external modem between the tracker and the communication network).

Applicants requested that all the claims be allowed based on how they compared to claim 1, which they had argued is different from the Fang prior art:

> ***In light of the foregoing amendments and remarks, it is respectfully requested that all the claims be allowed*** such that the application may be passed to issue.

(PHT 487). In the next communication from the Patent Office, all of the claims (amended and new) were allowed.


## IV.     ARGUMENT

### A.     The Law Of Claim Construction

The defendants understand the Court to be well-versed in the law of claim construction. Accordingly, we focus on those concepts that are material to the claim construction issues in this case.

### 1.     The Claims Should Be Construed In Light Of The Intrinsic Evidence

**The Claim Language.** "In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use. . . ." *Interactive Gift Express, Inc.* v. *Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001). "As a general rule, claim language carries the meaning of the words in their normal usage in the field of the invention." *Rambus Inc.* v. *Infineon Techs. AG*, 318 F.3d 1081, 1088 (Fed. Cir. 2003). Dictionaries and technical treatises are particularly useful resources in this regard:

> Dictionaries are always available to the court to aid in the task of determining meanings that would have been attributed by those of skill in the relevant art to any disputed terms used by the inventor in the claims.

*Tex. Digital Sys., Inc.* v. *Telegenix, Inc.*, 308 F.3d 1193, 1202 (Fed. Cir. 2002).

The patentee may not ignore claim limitations to make its case for infringement. "'We must give meaning to all the words in [the] claims.'" *Ethicon Endo-Surgery, Inc.* v. *United States Surgical Corp.*, 93 F.3d 1572, 1579, 1582 (Fed. Cir. 1996) (citation omitted). The mere fact that a patentee might have claimed something more or different does not justify reading an express limitation out of a claim:

> Indeed, to construe the claims in the manner suggested by TI would read an express limitation out of the claims. This, we will not do because "[c]ourts can neither broaden nor narrow claims to give the patentee something different than what he has set forth."

*Tex. Instruments Inc.* v. *United States Int'l Trade Comm'n*, 988 F.2d 1165, 1171 (Fed. Cir. 1993) (citation omitted). Furthermore, "[w]here claims use different terms, those differences are presumed to reflect a difference in the scope of the claims." *Forest Labs, Inc.* v. *Abbott Labs.*, 239 F.3d 1305, 1310 (Fed. Cir. 2001) (citation omitted).

**The Patent Specification.** "[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp.* v. *Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts* v. *XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

**The Prosecution History.** In addition to the words of the claim and the specification, the prosecution history "is of primary significance in understanding the claims." *Markman* v. *Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). *Accord Vitronics,* 90 F.3d at 1582 ("the record before the Patent and Trademark Office is often of critical significance in determining the meaning of the claims").

"Claims that have been narrowed in order to obtain issuance over the prior art cannot later be interpreted to cover that which was previously disclaimed during

prosecution," even if the resulting construction excludes the preferred embodiment. *Elekta Instrument S.A.* v. *O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302, 1308 (Fed. Cir. 2000) (reversing summary judgment of infringement and adopting claim construction that "exclude[s] the preferred and only embodiment disclosed in the specification"). *Accord Rheox, Inc.* v. *Entact, Inc.*, 276 F.3d 1319, 1326-27 (Fed. Cir. 2002) (affirming summary judgment of noninfringement:    "[W]here the prosecution history requires a claim construction that excludes some but not all of the preferred embodiments, such a construction is permissible and meets the standard of 'highly persuasive evidentiary support.'").

Furthermore, "arguments made during prosecution regarding the meaning of a claim term are relevant to the interpretation of that term in every claim of the patent absent a clear indication to the contrary." *Southwall Techs., Inc.* v. *Cardinal IG Co.*, 54 F.3d 1570, 1579 (Fed. Cir. 1995).

### 2. A Claim Construction Proceeding Is Not An Excuse For The Patentee To Rewrite Its Claims

"The *Markman* decisions do not hold that the trial judge must repeat or restate every claim term in order to comply with the ruling that claim construction is for the court." *United States Surgical Corp.*, 103 F.3d at 1568.  "[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy.  It is routine case management to require litigants to identify aspects of their case that are material to the dispute." *Vivid Techs. Inc.* v. *Am. Sci. & Eng'g, Inc*., 200 F.3d 795, 803 (Fed. Cir. 1999) (citation omitted).

Permitting the claims to be rewritten during litigation would defeat the public notice function of the intrinsic evidence.  "The claims, specification, and file history, rather than extrinsic evidence, constitute the public record of the patentee's claim, a record on

which the public is entitled to rely." *Vitronics,* 90 F.3d at 1583.  As the Federal Circuit has

explained:

> *Competitors* and the markets, as well as the courts, ***must be able to ascertain what subject matter is covered by this right to exclude***.  Public notice of the scope of the right to exclude, as provided by the patent claims, specification and prosecution history, is a critical function of the entire scheme of patent law.  ***The notice function is critical*** because it provides competitors with the necessary information upon which they can rely to shape their behavior in the marketplace.

*Litton Sys., Inc.* v. *Honeywell, Inc.*, 145 F.3d 1472, 1474 (Fed. Cir. 1998).  Accordingly, the

Supreme Court has directed Courts to "give[] proper deference to the role of claims in

defining an invention and providing public notice."  *Warner-Jenkinson Co.* v. *Hilton Davis

Chem. Co.*, 520 U.S. 17, 33-34 (1997).[5]

    The notice function is not limited to the four corners of the patent, but also

extends to the prosecution history.  "The public has a right to rely on . . . definitive

statements made during prosecution.  ***Notice is an important function of the patent

prosecution process***, as reflected by the statute itself. . . ." *Digital Biometrics, Inc.* v. *Identix,

Inc.*, 149 F.3d 1335, 1347 (Fed. Cir. 1998).

### B.    The Proper Construction of the Disputed Terms

    PHT asks the Court to construe every limitation of all sixteen asserted claims,

despite the defendants' attempt during the meet and confer process to persuade PHT to

construe a more limited set of limitations (as defendants are doing).  Because the defendants

believe PHT's attempt to rewrite its claims is contrary to law, this section of the brief

---

[5]    *See also Southwall Techs.*, 54 F.3d at 1578 ("A patentee may not proffer an interpretation for the purposes of litigation that would alter the indisputable public record . . . and treat the claims as a 'nose of wax.'") (citation omitted); *Springs Window Fashions LP* v. *Novo Indus., L.P.*, 323 F.3d 989, 994-95 (Fed. Cir. 2003).

addresses only those limitations that both plaintiff and defendants believe require construction. The remaining claims and limitations are addressed in § IV.C., *infra*.

### 1.    Independent Claim 22

Claim 22 recites:

A portable personal health tracker comprising:

a data logger that collects and records **subjective data** from a subject regarding the subject's psychological condition and subjectively observed physiological condition;

a time base which tracks a time of recording of the data;

a data storage unit in which the data is stored with reference to the time base such as to provide a chronological health history of the subject; and

**a data transmission device capable of connecting directly to a communication network** to allow transmission of data to a destination site from points of access to the network that are remote to the destination site,

wherein **each of the components of the health tracker is part of a single, unified portable unit** that may be used by an ambulatory patient.

(emphasis added to identify the phrases plaintiff and defendants believe should be construed).

As seen above, claim 22 is directed to a portable health tracker that includes four components: a data logger, a time base, a data storage unit, and a data transmission device. The data transmission device must be capable of connecting "directly" to a communication network to allow data from the unit to be transmitted to a remote destination. And all four components of the health tracker must be "part of a single, unified portable unit."

### a.    The "Connecting Directly" Limitation

The parties' dispute regarding the "connecting directly" claim limitation is set forth below. Defendants' proposed construction is for the emphasized language, while PHT's is for the entire limitation:

| Claim Language | Defendants' Proposed Construction | PHT's Proposed Construction |
|---|---|---|
| **a data transmission device capable of connecting directly to a communication network** to allow transmission of data to a destination site from points of access to the network that are remote to the destination site | a device that transmits data and can be connected to a communication network without requiring a separate unit (such as a computer or modem) between the data transmission device and the network | a component enabling connection of the data storage unit to a communications network, such as telephone network, the Internet, a LAN, or a WAN, to permit transmission of data to a destination site from a point distant and separate from the destination site without the data being processed by or accessed on an intervening computer. |

**The Parties' Dispute.**   The principal dispute between the parties is:  what does "capable of connecting directly" mean?

Under defendants' proposed construction, "directly" means that the data transmission device must be capable of connecting to a communication network without requiring a "separate unit" between the data transmission device and the network.  PHT, on the other hand, urges that a direct connection is established so long as an "intervening computer" is not used to process or access the data.   In other words, according to PHT, ***anything*** can be interposed between the data transmission device and the network – even an external modem – so long as it is not a "computer."  PHT's proposed construction is overly broad and impermissibly recaptures claim scope that was disclaimed during prosecution in order to obtain allowance of the claims.  *Elekta Instr.*, 214 F.3d at 1308.

**The Proper Construction.**   The prosecution history compels defendants' proposed construction.  During prosecution, the '985 patent applicants asserted that their invention was different from the prior art Fang reference because the claimed data

transmission device was part of the portable unit.  As the applicants explained, this enabled the unit to be "directly connected" to a communications network "without requiring connection via a *separate unit, such as* a personal computer" (PHT 485).

This emphasized prosecution history language makes two things plain:  (1) the direct connection must be such as to avoid the need for a "separate unit" between the data transmission device and the network; and (2) a computer is merely an *example* of ("such as") the separate unit that is prohibited from being between the data transmission device and the network.  PHT appears to have arrived at its erroneously broad construction by focusing on the words "personal computer," but ignoring the preceding phrase "such as."[6]

Defendants' proposed construction also is consistent with the plain and ordinary meaning of the word "directly."  The *American Heritage Dictionary of the English Language* (3d ed. 1996) defines "directly" to mean "without anyone or anything intervening."  Applying this definition to the claim language, the data transmission device must be capable of connecting to a communication network without anyone or anything intervening.  The definition provides no basis for selectively allowing some things to intervene (*e.g.*, modems), but not others (a computer).

The plain language of the claim and the arguments and amendments made during prosecution thus establish that the claimed invention requires the health tracker to be "directly" connectable to a communication network in the sense that no other unit – modem or otherwise – is interposed between the data transmission device and the network.  A health

---

[6]    Applicants' arguments distinguishing Fang apply to asserted claim 22.  As discussed above (*supra* § III.C.), the "capable of connecting directly" limitation that was added to claim 1 was also expressly indicated to be in claim 22.  Moreover, the applicants brought this similarity to the Examiner's attention in asking that "all the claims" be allowed.  Accordingly, the data transmission device of claim 22 must be able to connect to a communication network without requiring a separate unit – whether a modem, a computer, or any other kind of unit – between the data transmission device and the network.

tracker which requires the use of a separate unit, such as an external modem or personal computer, to connect to a network is outside the scope of claim 22.

**PHT's Erroneous Construction.** PHT's construction should be rejected for a number of reasons. As discussed above, PHT's construction relies on the words "personal computer" to the exclusion of the phrase "such as," and also is not supported by the plain meaning of the claim language.

In addition, the claim language is clear that it is the "data transmission device" that must be capable of connecting directly to a communication network. PHT's construction instead requires the "data storage unit" – a different one of the four components recited in the claim – to be capable of the direct connection. There is no basis for PHT's substitution.

PHT also converts the claim phrase "points of access . . . remote to the destination site" into "*a point* remote to the destination site." PHT's rewrite broadens the claim because it opens the door for PHT to argue that the limitation is met by showing only one such site in the accused devices.

Moreover, the details of PHT's construction make little sense. It is unclear why, for example, PHT sees the need to change the phrase "allow transmission of data" to "permit transmission of data." There is no reason to replace the word that appears in the claim as drafted by the applicants and issued by the Patent Office.

For all of these reasons, the Court should adopt defendants' proposed construction.

          **b.**      **The "Part Of A Single, Unified Portable Unit" Limitation**

Claim 22 further requires that the four components of the health tracker be "part of a single, unified portable unit." The parties' proposed constructions for this claim limitation are set forth below:

| Claim Language | Defendants' Proposed Construction | PHT's Proposed Construction |
|---|---|---|
| wherein **each of the components of the health tracker is part of a single, unified portable unit** that may be used by an ambulatory patient | the data logger, time base, data storage unit and data transmission device are all included within a single, unified portable unit | the health tracker's components are combined into a unit which is capable of being carried by a patient |

**The Parties' Dispute.** The parties' dispute centers on whether the four recited components are "included within a single, unified portable unit" (as defendants propose), or are "combined into a unit which is capable of being carried by a patient" as PHT urges.

**The Proper Construction.** The intrinsic evidence supports defendants' proposed construction, not PHT's. First, defendants' construction comports with the ordinary meaning of the claim language. For the components of the health tracker to be "part of" a single unit, they must be physically included within the unit. As a matter of language – as well as common sense – if one or more of the components is outside the unit, they cannot all be part of a single, unified unit.

Moreover, during prosecution the applicants added the "single, unified portable" unit language to pending claim 1 – and also included it in new claim 22 –thereby excluding from the scope of the claim devices which use a component not physically included within the unit, such as an external modem. Similarly, the applicants also described the handheld unit of the invention as being "a single, unified handheld unit that ***includes*** an on-board communication device, such as a modem" (PHT 485).[7] The prosecution history

---

[7] As noted above, all three characteristics that the applicants identified in distinguishing claim 1 from the Fang prior art (*see* bulleted text on p. 10 *supra*) apply to claim 22 as well.

thus compels the defendants' construction that the data transmission device is included within the portable unit

       Likewise, the patent specification describes an alternate embodiment in which a PCMCIA modem 110 is in data logger 106 (*see* illustration at p. 10, *supra*). This is the only disclosed modem embodiment that survived prosecution of the asserted claims. Product literature for the Apple Newton® Message Pad referred to in the patent specification describes how a PCMCIA modem may be inserted "all the way into" the slot in the handheld unit (Defendants' App. A at p. 35). Such a modem thus is included within the handheld unit, consistent with the applicants' argument to the Patent Office that "the claimed invention is a device that can be carried by a patient wherever he or she goes" (PHT 485).

       **PHT's Erroneous Construction.** PHT replaces the requirement that four components of the claim be "part of a single, unified . . . unit" with the words "combined into a unit." PHT's rewrite inappropriately waters down this claim limitation. Although "part of," "included within" and "combined into" might be roughly synonymous, PHT's construction dispenses with the critical claim requirements that the device be "single" and "unified." PHT used those words to obtain its patent during prosecution, and cannot jettison them now to broaden its claims in litigation. *Ethicon*, 93 F.3d at 1579, 1582. Under PHT's construction, the data transmission device may be an external modem – precisely what was disclaimed during prosecution.

       Indeed, unlike the word "included" (in defendants' proposed construction), which comes from the prosecution history (PHT 485), the word "combined" does not. Despite the fact that the claim limitation at issue was added and addressed during prosecution as a key distinguishing feature over the prior art, PHT's intrinsic support for this limitation is devoid of any reference to the prosecution history (*see* Joint Claim Construction Statement, D.I. 32 at p. 6, third column).

Finally, there is no need to replace the word "portable" with the nine-word phrase "which is capable of being carried by a patient." All things being equal, the simpler the construction, the better – and the jury will understand what it means for a device to be "portable."

### c.    The "Subjective Data" Limitation

The parties also disagree about the meaning of "subjective data," which appears in the limitation of claim 22 directed to the "data logger" (PHT construes the entire limitation, not just the emphasized language):[8]

| Claim Language | invivodata's/CRF's Proposed Construction | PHT's Proposed Construction |
|---|---|---|
| a data logger that collects and records **subjective data** from a subject regarding the subject's psychological condition and subjectively observed physiological condition | data which is input by the patient to the data logger, regardless of whether that data pertains to the subject or the subject's environment, and whether or not the information is objective or factual, such as medication dosage or consumption of a particular food | a component which can collect and record data input by the patient regarding the patient's psychological condition and subjectively observed physiological condition |

The specification explicitly defines "subjective data":

> **[T]he term 'subjective' data will refer to** that data which is input by the patient to the data logger 106, regardless of whether that data pertains to the patient or the patient's environment, and whether or not the information is objective or factual, such as medication dosage or consumption of a particular food."

(col. 5:40-45.)  "[W]hen the patentee 'has chosen to be his or her own lexicographer by clearly setting forth an explicit definition for a claim term,'" the Court will read the patentee's definition into the claim. *Abbott Labs.* v. *Novopharm Ltd.*, 323 F.3d 1324, 1330

---

8    eTrials believes it is unnecessary to construe the term "subjective data," but does not oppose the construction offered by invivodata and CRF.

(Fed. Cir. 2003) (citation omitted).    PHT's construction should be rejected on this ground alone.

PHT's construction also should be rejected because it inappropriately broadens the claim.  Under PHT's claim rewrite, a data logger that "can" collect and record – even if it does not actually "collect[] and record[]" as required by the claim language as written – is within the scope of the claim.

## 2. <u>Independent Claim 34</u>

Unlike claim 22, which is directed to a portable health tracker, claim 34 is directed to a health tracking *system* made up of a portable half and a remote half.  The data logger, time base and data transmission device are all part of a "portable unit," while the data storage location is located "remote[ly] from the portable unit":

34.    A personal health tracking system comprising:

a portable unit having a data logger that collects and records **subjective data**[9] from a subject regarding the subject's psychological condition and subjectively observed physiological condition;

a time base of the portable unit which tracks a time of recording of the data;

a data storage location remote from the portable unit in which the data is stored with reference to the time base such as to provide a chronological history of the subject's psychological condition; and

**a data transmission device of the portable unit that transmits data to the data storage location via a digital data network**.

### a. <u>The "Of The Portable Unit" Limitation</u>

The parties' dispute regarding the "of the portable unit" limitation is set forth below:

---

[9]    The term "subjective data" in claim 34 should be construed the same way as it is construed in claim 22.  *See Southwall Techs.*, 54 F.3d at 1579.

| Claim Language | Invivodata's and CRF's Proposed Construction | eTrials' Proposed Construction | PHT's Proposed Construction |
|---|---|---|---|
| **a data transmission device of the portable unit** that transmits data to the data storage location via a digital data network | a device, included within the portable unit, that transmits data without requiring a separate unit (such as a computer or modem) between the data transmission device and the network | a device that transmits data and is included within the portable unit | a component enabling connection of the portable unit to a communications network to permit transmission of data to the data storage location site without the data being processed by or accessed on an intervening computer. |

The parties' dispute centers on what it means for the data transmission device to be "of the portable unit." Rather than construe this limitation, PHT ignores it and instead injects a number of other limitations that are not in the claim.

**The Proper Construction.** The plain language of claim 34 assigns a location to each component of the health tracking system. The data logger, time base, and data transmission device are all part of (*i.e.*, included within) the portable unit, while the data storage location is remote from (*i.e.*, outside) the portable unit. And in particular, the data transmission device, the subject of the claim construction dispute between the parties, is included within.

This is consistent with the prosecution history, during which the external modem embodiment was disclaimed. In arguing the patentability of claim 1, the applicants identified three characteristics distinguishing claim 1 over the Fang prior art (*see* bulleted text on p. 10 *supra*). Based on applicants' comparison of claim 34 to claim 1, the first (handheld unit) and third (data transmission device is part of a single, unified handheld unit) bullets also apply to claim 34, compelling the Defendants' construction that the data transmission device is included within the portable unit.

There is a reason why the "data transmission device" should be construed as being "included within" the portable unit in claims 22 *and* 34, despite their different language ("single, unified portable unit" in claim 22 vs. "of the portable unit" in claim 34). As noted above, all of the claimed components are in the portable unit of claim 22, whereas one of the claimed components is outside the portable unit in system claim 34. Accordingly, in claim 34 the patentees could not claim, as they did in claim 22, that each of the components is "part of a single, unified portable unit." Instead, the time base and data transmission device of claim 34 are specified as being "of the portable unit," while the data storage location is said to be "remote from the portable unit."

**PHT's Erroneous Construction.** Rather than construing the claim requirement that the data transmission device be "of the portable unit," PHT eliminates it altogether in committing the first of a series of errors.

PHT's first error is to convert the claim phrase "data transmission device *of* the portable unit" into the very different concept of "component *enabling connection of* the portable unit." By changing "of" to "enabling connection of," PHT eliminates the claimed direct physical relationship between the data transmission device and the portable unit (the former is part of the latter). The new phrase instead purports to describe what the data transmission device does (connect to a communications network to permit transmission of data). PHT's switch changes the meaning of the claim language.

Second, PHT's proposed construction is erroneous in referring to "enabling connection of the portable unit to a *communications network* to permit transmission of data . . ." The phrase "communications network" appears nowhere in the claim. Rather, the claim is directed to a "digital data network," which unasserted claim 47, for example, makes clear is narrower than a "communications network":

> A personal health tracking system according to claim 43 **wherein the communication network comprises a digital data network** and the portable unit is connectable directly to the data network a local data network access connection.[10]

Indeed, the applicants relied on the fact that claim 34 was "limited" to a digital data network" in their arguments to the Patent Office:  "New Claim 53 [issued claim 34] is also similar to Claim 1, but is **limited** to a data transmission device that transmits data to a remote storage location via a **digital data network**."  PHT's attempt to broaden its claim during litigation in the face of what was represented to the Patent Office during prosecution should be rejected.

Third, PHT's construction broadens the claim to capture any device that "**permits the transmission of** data," in contrast to the claimed "data transmission device . . . that **transmits** data . . ."  There is no basis for this broadening of the claim.  If the applicants had wanted broader language, they knew how to include it (*see*, *e.g.*, claim 22, which recites "a data transmission device capable of connecting directly . . . **to allow transmission of** data . . .").

Fourth, PHT grafts the word "site" onto the end of the phrase "data storage location" that appears in the claim.  It is unclear why PHT does so, other than perhaps to achieve yet another broadening of the claim, this time to cover systems in which data is transmitted not to a data storage location, but rather to a general "site" where the data storage location is situated.  Whatever PHT's motivation, its attempt to change the claim language should be rejected.

Finally, echoing its arguments for claim 22, PHT misreads the prosecution history to require claim 34 to transmit data "without the data being processed by or accessed

---

[10]     As noted in § IV.B.2.b., *infra*, claims 46 and 47 make plain that a public telephone network and a digital data network are both subsets of the broader term "communication network."

on an intervening **computer**."  The prosecution history disclaimer was broader than that, for

the reasons discussed in connection with claim 22.  The applicants argued that their claimed

invention enabled the unit to be directly connected to a communications network "without

requiring connection via a **separate unit, such as** a personal computer" (PHT 485).  That is,

an intervening "computer" was just an **example** of what could not intervene.

Thus if the claim is construed to require a "direct connection," the

construction should be worded as invivodata and CRF propose – *i.e.*, consistently with how

claim 22 is properly construed – to prohibit the use of "a separate unit (such as a computer or

modem) between the data transmission device and the network)."[11]

### b.    The "Digital Data Network" Limitation

The parties' dispute regarding the "digital data network" limitation is set forth

below.

| Claim Language | Defendants' Proposed Construction | PHT's Proposed Construction |
|---|---|---|
| a data transmission device of the portable unit **that transmits data to the data storage location via a digital data network** | the data transmission device transmits data to the data storage location via a network, other than a telephone network, that transmits data digitally rather than in analog form | At least a portion of that transmission takes place on a digital data network – a network capable of transmitting digital data. |

---

[11]    eTrials does not believe that claim 34 requires a direct connection between the data transmission device and the network, because (a) unlike claim 22, claim 34 does not explicitly recite such a requirement; and (b) in comparing claim 34 to claim 1 during prosecution, the applicants noted that the data transmission devices of the two claims are different.  However, to the extent the Court is inclined to construe claims 22 **and** 34 to require a direct connection, eTrials believes that the construction urged by invivodata and CRF should be adopted for the reasons set forth in the text accompanying this footnote.  Having proposed virtually identical language for claims 22 and 34, PHT apparently agrees with invivodata and CRF that claim 34 requires some sort of direct connection.

The parties' dispute centers on the definition of the claimed digital data network.

**The Proper Construction.**  The claims make clear that a digital data network and a telephone network are two different things.  While the communication network of unasserted claim 46 comprises a telephone network:

> 46.  A personal health tracking system according to claim 43 wherein the communication network comprises a ***public telephone network*** and the portable unit comprises a modem that is directly connectable to the telephone network.

the communication network of unasserted claim 47 comprises a digital data network:

> 47.  A personal health tracking system according to claim 43 wherein the communication network comprises a ***digital data network*** and the portable unit is connectable directly to the data network a local data network access connection.

Under principles of claim differentiation, "[w]here claims use different terms, those differences are presumed to reflect a difference in the scope of the claims."  *Forest Labs., Inc.* v. *Abbott Labs.*, 239 F.3d 1305, 1310 (Fed. Cir. 2001) (citation omitted).  Thus the patent uses the term "digital data network" to mean something ***other than*** a telephone network.  Moreover, a digital data network transmits data digitally, rather than in analog form.[12]

---

[12]    The patent specification also differentiates between a telephone network and a data network:

> Preferably, the data link from each of the health trackers 108 and each of the data loggers 106 to the database is established using an associated modem 110, ***and some combination of a telephone network and a data network***.  In the ***present embodiment***, the modem 110 directly connects via ***telephone*** to one of the computers that support the database 102.  In the ***alternative***, the modem may connect to a local network access computer and ***transmit data to the database via the network connection***.

(col. 5: 22-30).  This distinction is illustrated in the figure at p. 6, *supra*.

Moreover, during prosecution, the applicants argued the patentability of claim 1, which recited among other things a "communication network."  They also argued the patentability of claim 34, which dropped several limitations of claim 1 in favor of a limitation requiring a specific kind of network – a "digital data network":

> New claim [34] is also similar to Claim 1, **but is limited to** a data transmission device that transmits data to a remote storage location via a **digital data network**.

(PHT 487).  The applicants thus expressly relied on the "digital data network" limitation to argue patentability, and the limitation may not be vitiated now in litigation.

**PHT's Erroneous Construction.**  PHT construes a digital data network to mean "a network capable of transmitting digital data."  PHT's broadening construction is incorrect because it ignores the clear distinction in the intrinsic evidence of the patent between a "digital data network" and a "telephone network," and in doing so eliminates the "digital data network" limitation from the claim.

*Any* communications network is capable of transmitting digital data, *i.e.*, data that is "expressed in digits."  *See The American Heritage Dictionary of the English Language* (3d ed. 1996), p. 506.   A telephone network, for example, may transmit digital data by first converting the data into analog form, transmitting the data in analog form, and then converting the data back into digital form at the receiving end.  What makes a digital data network different is that it transmits data *digitally*, in digital form rather than analog form.

If PHT's construction were adopted, the network of claim 34 would be no different than the "communication network" of claim 22.  That would violate principles of claim differentiation and defy the prosecution history, as discussed above.[13]

---

[13]     PHT's construction also should be rejected because it unnecessarily replaces the simple word "via" with the phrase "[a]t least a portion of that transmission takes

(Continued…)

3.     **Dependent Claims 29-30**

a.     **The "Digitized . . . Writing" Limitations**

Dependent claims 29 and 30 recite the limitations "digitized representation of the detected writing" and "digitized representation of the subject's writing." Defendants' proposed construction (set forth below) is for the emphasized language, while PHT's is for the entire limitation:

| Claim Language | Defendants' Proposed Construction | PHT's Proposed Construction |
|---|---|---|
| 29. A portable personal health tracker according to claim 22 further comprising a tactile input device on which the subject may write and the subject's writing is detected, said tactile input device generating a **digitized representation of the detected writing**.<br><br>30. A portable personal health tracker according to claim 29 wherein the **digitized representation of the subject's writing** is transmittable via the data transmission device. | Digital data that represents the subject's handwriting | Claim 29: The health tracker includes a tactile input device, such as a pad or portion of a screen, that can sense a pattern created by touching the tactile input device, such as when a patient writes on the device, and create a digital record of the pattern or writing.<br><br>Claim 30: The health tracker can use the data transmission device to transmit the digital record of the pattern created on the tactile input device. |

(…Continued)
place on." The word "via" is not a technical term that is outside the grasp of the jury. It is readily understood by anyone who drives to Philadelphia "via" I-95.

**The Parties' Dispute.**  The primary dispute between the parties is whether this term is limited to a subject's handwriting, or can encompass a digital record of any pattern detected by the device.[14]  The defendants' proposed construction tracks the language of the claims, and requires only that there be a digitized representation of the subject's ***handwriting***.  PHT, on the other hand, impermissibly broadens this claim to include a digital record of a ***pattern or writing***.  PHT's proposed construction is contrary to the plain language of the claim and the specification.

**The Proper Construction.**  Claim 29 recites that "the subject may write" on the tactile input device of the tracker, and the tactile input device generates a digitized representation of that "writing."   Claim 30 adds that the digitized representation of the subject's "writing" may be transmitted via the data transmission device.  Nothing in these claims suggests that they cover any digital record of a "pattern" that is not handwriting.

**PHT's Erroneous Construction.**  PHT's construction is so broad that it would presumably cover any tactile input (*e.g.*, using a pen on a touch-sensitive screen) that is digitally recorded in any way.  The '985 patent specification, however, differentiates between such input and handwriting.  In particular, the specification describes that the subject may use a pen to enter some of the subjective data into the tracker (s*ee, e.g.*, col. 24:51-53 ("Data selections are made by the patient touching the pen 202 to a portion of the display 204 of the human body which corresponds to a location of pain on their own body.")).

Later, however, the specification separately describes the ability to allow the subject to communicate by using handwriting:

---

[14]     PHT also proposes to rewrite the rest of the language of this claim using unsupported and unnecessary language.  This section addresses the parties' dispute with respect to only the "digitized representation" language.

> Shown in FIG. 20A is a message screen of the subjective data logger in which
> a space 250 is provided where ***the patient may write a message*** to a person
> who reviews his or her database records, such as a reviewing physician. In the
> preferred embodiment, the message is transmitted as bit-mapped data, such
> that the when displayed by the recipient, ***it appears in the handwriting of the***
> ***patient***.

(col. 26: 44-50 (emphasis added)).  The specification thus makes clear that "writing" refers

not to any record of tactile input by a subject, but instead specifically to the subject's

handwriting.  This distinction in the specification, together with the plain and unambiguous

language of the claims, compels the defendants' proposed construction.

### 4.     Dependent Claim 36

#### a.     The "Public Data Network" Limitation

The parties' dispute regarding the "public data network" limitation of Claim

36 is set forth below:

| Claim Language | Defendants' Proposed Construction | PHT's Proposed Construction |
|---|---|---|
| **wherein the digital data network comprises a public data network** | A publicly accessible network, other than a telephone network, that transmits data digitally rather than in analog form. | At least a portion of the network that transmits data from the portable unit can be generally accessed by the public, such as a telephone network, a WAN available to the public, or the Internet |

**The Proper Construction.**  Dependent claim 36 requires the "digital data

network" of claim 34 to be a "public data network."  As a result, the proper construction

simply requires adding the word "public" to the "digital data network" construction for claim

34.

**PHT's Erroneous Construction.**    PHT's construction is incorrect because

it requires only that some part of the entire network be public, not necessarily the "digital

data network" portion.  This is contrary to the plain language of the claim. Moreover, by

including the phrase "such as a telephone network," PHT's construction ignores the distinction between a "digital data network" and a "telephone network," the latter of which is not a digital data network within the meaning of the patent.

### 5.     Dependent Claims 38-40

#### a.     The "Connection Device" Limitations

Dependent claims 38-40 cover various ways in which the data transmission device of claim 34 may transfer data to the data storage location. In all three claims, the data transmission device comprises a "connection device" that facilitates connection to the data network.[15]

As discussed above (*supra* § III.A.), the patent describes that data may be transmitted to a remote database (*e.g.*, the "data storage location") by a telephone connection or a data network connection. The data transmission device may be a "modem 110 or other data transfer device which transfers the data to the database 102 using a known data transfer protocol" (col. 26:34-38).

**Claim 38.** Unlike claim 39, claim 38 does not specify that the connection device comprises a modem. Thus, the connection device of claim 38 may comprise, for example, devices such as a modem or other data transfer device that uses a known data transfer protocol. The parties' proposed constructions of claim 38 are as follows:

| Claim Language | Defendants' Proposed Construction | PHT's Proposed Construction |
|---|---|---|
| 38. A personal health tracking system according to claim 34 wherein **the data transmission device comprises a connection** | the data transmission device includes a device, such as a modem or other data transfer device that uses a known data transfer protocol, which | the data transmission device includes a component that enables or makes easier a connection between the portable unit |

---

[15]     Because the patent does not use the term "connection device" anywhere outside the claims, defendants intend to raise a Section 112 defense at the appropriate time.

| Claim Language | Defendants' Proposed Construction | PHT's Proposed Construction |
|---|---|---|
| **device that facilitates connection to the data network** | facilitates connection of the portable unit to the digital data network | and the data network |

**The Parties' Dispute.**  The parties' dispute regarding claim 38 involves two questions:  (1) whether it is helpful to provide the jury with non-limiting examples of a "connection device" (particularly in light of PHT's wide-ranging infringement contentions, discussed below) and (2) what the ordinary meaning of "facilitates" is.

PHT offers no construction for the phrase "connection device."  Instead, PHT simply renames the connection device as a "component," which provides utterly no guidance as to what is meant by the term.  Defendants' construction, on the other hand, provides examples of what a connection device is – but without limiting the claim to those examples (which would be improper).  Defendants' construction also does not improperly expand the meaning of the word "facilitates."

**The Proper Construction.**  Claim 38 calls for a "connection device that facilitates connection to the data network."  Claim 39, which depends from claim 38, makes clear that a "modem" is one example of a connection device.

Moreover, the portion of the patent specification cited by PHT as intrinsic support for this claim limitation states that the patient "connects the data logger 106 ***to modem*** 110 ***or another data transfer device*** which transfers the data to the database 102 using a known data transfer protocol" (col. 26:34-38).  Therefore, according to PHT's own intrinsic evidence, another example of a connection device is a data transfer device that uses a known data transfer protocol.

Claim 38, being broader than claim 39, thus covers connection devices "such as" a modem or other data transfer device that uses a known data transfer protocol.  The

"such as" language provides the jury with some guidance as to what the connection device could be, without limiting the claim to those examples.

The jury will need some guidance, if PHT's infringement allegations are any indication of what is to come at trial. PHT alleges in the *eTrials* case that the connection device limitation is met by a "cradle" or "cable," two things which have no support in the intrinsic evidence that PHT cites for claims 38-40 (Defendants' App. B at 7). PHT's litigation-inspired reading of its patent claims – and its attempt to obtain maximum leeway at trial by avoiding any construction of the phrase "connection device" – should be rejected.

Including non-limiting examples in the constructions of these claims will prevent this problem, and will provide the jury with the guidance it needs to decide the infringement issues. PHT cannot fairly object to including non-limiting examples in the claim construction. PHT includes the phrase "***such as*** telephone network, the Internet, a LAN, or a WAN" in its own construction of "data transmission device" in claim 22.

Claim 38 further requires the connection device to "facilitate" connection to the data network. PHT replaces "facilitate" with the words "to make easier ***or enable***." But the plain and ordinary meaning of "facilitate" is "to make easy or easier." *The American Heritage Dictionary of the English Language* (3d ed. 1996) at 653. Adding the word "enable" thus expands the claim scope, and PHT's attempt to do so should be rejected.

In defendants' view, "facilitates" is not a word that needs construction. The jury will understand it. Should the Court, however, be inclined to construe that word, it should be defined as "makes easier."

**Claims 39 and 40.** Claims 39 and 40 cover different subsets of what claim 38 covers, and the parties' dispute regarding these claims is set forth below:

| Claim Language | Defendants' Proposed Construction | PHT's Proposed Construction |
|---|---|---|
| 39. A personal health tracking system according to claim 38 wherein **the connection device comprises a modem that is connectable directly to a public telephone network** | the data transmission device includes a modem, which can be connected to a public telephone network without requiring a separate unit (such as a computer or modem) between the data transmission device and the network | The connection device includes a modem that can connect directly to a telephone network that can be accessed by the public. |
| 40. A personal health tracking system according to claim 38 wherein **the connection device is connectable directly to a local data network access connection** | the connection device can be connected directly to a local point of access for the digital data network without requiring a separate unit (such as a computer or modem) between the data transmission device and the local point of access | The connection device can connect directly to a local point of access for a data network, such as an Ethernet port |

**The Parties' Dispute.** The main difference between the parties' constructions is that PHT proposes to leave the phrase "connectable directly" unconstrued. However, in light of the specific meaning the patent applicants attached to that term during prosecution to obtain their patent claims, that meaning should be reflected in the construction of these claims just as it is in other claims that include the "connectable directly" concept.

**The Proper Construction.** Claim 39 is directed to the case where a direct telephone connection is used to transfer data to the data storage location. This is consistent with the applicants' argument during prosecution that "[f]or example, the handheld unit may have a modem that is simply plugged into a telephone jack" (PHT 485).

As discussed above for claim 22 (§ IV.B.1.a.), the phrase "capable of connecting directly" means that a "separate unit (such as a computer or modem)" is not required between the data transmission device and the network. Because "connectable

directly" (claim 39) and "capable of connecting directly" (claim 22) are used the same way in the two claims, the Court should construe the term "connectable directly" to mean that a separate unit (such as a computer or modem) may not be interposed between the modem and the public telephone network. *Southwall Techs.*, 54 F.3d at 1579. PHT should not be permitted to recapture claim scope that was disclaimed during prosecution.

For the same reason, the "connectable directly" phrase of claim 40 should be construed to mean that there cannot be a separate unit between the connection device and the local data network access connection.

### C.    The Additional Constructions Sought by PHT

In addition to the disputed claim limitations discussed above, PHT asks the Court to replace all of the remaining limitations with new language. The defendants believe that PHT's approach is contrary to law for the reasons discussed in § IV.A.2., *supra*, and in any event unnecessary because the claim language is readily understandable based on its plain and ordinary meaning.

Accordingly, defendants have limited this section of the brief to addressing only a few examples of PHT's defective constructions, in lieu of burdening the Court at this time with a catalog of the numerous errors in PHT's proposals. The defendants are prepared to address at the claim construction hearing or in their answering memorandum the other errors in PHT's proposed constructions.

#### 1.    PHT's Constructions Alter The Claim Scope

**Claim 22 – "Time of Recording."** Claim 22 exemplifies PHT's attempts to rewrite the asserted claims to alter their meaning and scope. The second element in claim 22 is "a time base which tracks a time of recording of the data," which PHT proposes to construe as "a component which records the time of entry of the data into the data logger."

PHT's construction completely changes the meaning of the claim limitation. Instead of the time base tracking the "***time of recording***" of the data, PHT's construction requires that the time base "record the ***time of entry***" of the data. These are two different things, as other language in Claim 22 confirms. Claim 22 requires a "data logger that ***collects and records***." The claim thus distinguishes between collecting data (*i.e.*, when the data is entered into the device) and recording data. PHT's construction should be rejected because it improperly eliminates this distinction and alters the plain meaning of the claim. *See Interactive Gift*, 256 F.3d at 1331.

### 2.     PHT's Constructions Introduce Unnecessary Synonyms

PHT's proposed constructions also introduce synonyms of the claim language for no apparent reason. For example, as discussed above (at the end of § IV.B.1.a, *supra*), PHT purports to construe the claim language by replacing the phrase "allow transmission of data" to "permit transmission of data." This is improper. *See Vivid Techs.*, 200 F.3d at 803.

### 3.     PHT's Constructions Complicate Unambiguous Claim Language

**Claim 26 – "Hand-held device."**   This claim requires that the health tracker of claim 22 be "a hand-held device." PHT proposes to construe that limitation as: "The health tracker is small enough and light enough to be carried by a patient in his or her hand." Even assuming that PHT is not trying to inject extraneous limitations into the claim to distinguish the prior art, defendants see no need to expand a straightforward phrase into a long sentence under the guise of claim construction. The purpose of claim construction is to assist the jury in understanding the scope of the claims. The jury will understand what "hand-held" means.

## V.    **CONCLUSION**

For the foregoing reasons, the Court should adopt defendants' proposed constructions and reject PHT's proposed constructions.

MORRIS, NICHOLS, ARSHT & TUNNELL

/s/   Julia Heaney (#3052)
Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 N. Market Street
Wilmington, DE 19801
(302) 658-3989
jheaney@mnat.com
*Attorneys for Defendant eTrials Worldwide, Inc.*

*Of Counsel*:
Laurence S. Rogers
Avinash S. Lele
Brian P. Biddinger
ROPES & GRAY LLP
1251 Avenue of the Americas
New York, NY 10020
(212) 596-9000
*Attorneys for eTrials Worldwide, Inc.*

POTTER ANDERSON & CORROON LLP

/s/   Richard L. Horwitz (#2246)
Richard L. Horowitz (#2246)
David E. Moore (#3983)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19899
(302) 984-6000
rhorwitz@potteranderson.com
*Attorneys for Defendants invivodata, Inc. and CRF, Inc.*

*Of Counsel*:
Cecilia H. Gonzalez
Brian Rosenthal
HOWREY SIMON ARNOLD & WHITE
1299 Pennsylvania Ave.
Washington, D.C. 20004
*Attorneys for invivodata, Inc.*

*Of Counsel*:
Victor H. Polk, Jr.
Lawrence T. Stanley, Jr.
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110
(617) 951-8000
*Attorneys for CRF, Inc.*

March 11, 2005

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that on March 11, 2005, I electronically filed Defendants' Opening *Markman* Brief with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

> Josy W. Ingersoll (#1088)
> Kevin M. Baird (#4219)
> The Brandywine Building
> 1000 West Street, 17th Floor
> P.O. Box 391
> Wilmington, DE  19899
> jingersoll@ycst.com

> Richard L. Horwitz (#2246)
> Potter Anderson & Corroon LLP
> 1313 N. Market Street
> Wilmington, DE  19801
> rhorwitz@potteranderson.com

and I, the undersigned, also hereby certify that on March 11, 2005, I sent by Federal Express, the above-stated document to:

> Anthony Herman
> Covington & Burling
> 1201 Pennsylvania Avenue
> Washington, DC 20004-2401

> MORRIS, NICHOLS, ARSHT & TUNNELL
> /s/ *Julia Heaney*
> Jack B. Blumenfeld (#1014)
> Julia Heaney (#3052)
> 1201 North Market Street
> P.O. Box 1347
> Wilmington, Delaware 19899
> (302) 658-9200
> Attorneys for Defendant eTrials Worldwide, Inc.
> jheaney@mnat.com