**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| PHT CORPORATION, | ) | |
|         Plaintiff, | ) | |
| v. | ) | C.A. No. 04-60 (GMS) |
| | ) | |
| INVIVODATA, INC., | ) | |
|         Defendant. | ) | |

| | | |
|---|---|---|
| PHT CORPORATION, | ) | |
|         Plaintiff, | ) | |
| v. | ) | C.A. No. 04-61 (GMS) |
| | ) | |
| CRF, INC., | ) | |
|         Defendant. | ) | |

| | | |
|---|---|---|
| PHT CORPORATION, | ) | |
|         Plaintiff, | ) | |
| v. | ) | C.A. No. 04-821 (GMS) |
| | ) | |
| ETRIALS WORLDWIDE, INC. | ) | |
|         Defendant. | ) | |

### DEFENDANTS' ANSWERING *MARKMAN* BRIEF

MORRIS, NICHOLS, ARSHT & TUNNELL
Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 N. Market Street, P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jheaney@mnat.com
  Attorneys for Defendant eTrials Worldwide, Inc.

POTTER, ANDERSON & CORROON LLP
Richard L. Horwitz (#2246)
David E. Moore (#3983)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19899
(302) 984-6000
dmoore@potteranderson.com
  Attorneys for Defendants invivodata, Inc. and CRF, Inc.

April 1, 2005

**TABLE OF CONTENTS**

Page

I.    NATURE AND STAGE OF THE PROCEEDING ...................................................1

II.   SUMMARY OF ARGUMENT...........................................................................1

III.  ARGUMENT.................................................................................................3

      A.    An External Modem Was Disclaimed During Prosecution...............................3

      B.    PHT's Proposed Claim Constructions Are Incorrect.......................................7

            1.    "Subjective Data" ...........................................................................7

            2.    "Data Transmission Device Capable of
                  Connecting Directly to a Communication Network" ...............................8

            3.    "Single, Unified, Portable Unit"........................................................8

            4.    "Digitized Representation of Writing" .................................................9

            5.    "Data Transmission Device of the Portable Unit"..................................10

            6.    "Digital Data Network" ...................................................................11

            7.    "Public Data Network" ....................................................................13

            8.    "Connection Device" .......................................................................13

            9.    "Modem that is Connectable
                  Directly to a Public Telephone Network" .............................................14

            10.   "Connectable Directly to a Local Data
                  Network Access Connection"..............................................................15

      C.    PHT Never Explains Why Or How The
            Remaining Claim Terms Should Be Construed.................................................15

IV.   CONCLUSION .............................................................................................16

**TABLE OF AUTHORITIES**

**Page**

<u>**CASES**</u>

*Abbott Labs.* v. *Novopharm Ltd.*,
   323 F.3d 1324 (Fed. Cir. 2003) ........................................................................ 7

*Elekta Instrument S.A.* v. *O.U.R. Scientific Int'l, Inc.*,
   214 F.3d 1302 (Fed. Cir. 2000) .................................................................... 2, 7

*Forest Labs, Inc.* v. *Abbott Labs.*,
   239 F.3d 1305 (Fed. Cir. 2001) ...................................................................... 12

## I.    NATURE AND STAGE OF THE PROCEEDING

Defendants' Opening *Markman* Brief (D.I. 35), filed March 11, 2005, summarized the nature and stage of the proceeding.  The Court's Scheduling Order provides a possible opportunity for early summary judgment motions following the issuance of a *Markman* order (D.I. 30 at ¶ 8.a).  A ten day jury trial has been set to commence April 3, 2006 (*Id.* at ¶ 16).

Defendants submit this joint brief in response to plaintiff PHT's Opening Brief On Claim Construction (D.I. 34), also filed on March 11.  This brief focuses on responding to the arguments in PHT's brief, rather than repeating the arguments in defendants' previous brief.

## II.    SUMMARY OF ARGUMENT

Defendants' opening brief demonstrates that PHT's proposed constructions amount to a comprehensive rewrite of the claim language that was issued by the Patent Office.  To avoid the fact that it expressly disclaimed the scope it now wants to claim, PHT goes even further in its opening brief and attempts to rewrite the prosecution history itself.

During prosecution, the applicants argued for patentability by distinguishing prior art cited by the Patent Examiner.  They argued that the claimed invention is a self-contained portable unit that does not need a "separate unit" to access a communication network because it includes an on-board communication device, such as a modem:

> A particularly useful feature in this regard is the construction of the monitor to allow direct access to a communications network *without requiring connection via a separate unit*, such as a personal computer.  That is, the monitor is a *single, unified handheld unit that includes an on-board communication device, such as a modem*.

(Joint App. Ex. C at PHT 485).  The applicants thus disclaimed coverage for devices that are not self-contained, *e.g.*, that must connect to a separate, external modem to access a network.

PHT nonetheless urges that the asserted claims cover devices used with an external modem. PHT manages to do this by rewriting the prosecution history, changing the first sentence quoted above to refer to a "secondary control unit" instead of a "separate unit," and changing the second sentence to refer to a "telecommunications driver" instead of a "modem" (Br. 11, fifth and second lines from the bottom).[1]

PHT's rewrite is without basis, and all of the proposed constructions that depend on its rewrite should be rejected. The applicants having argued patentability by urging that the claimed invention is "a single, unified handheld unit that includes an on-board communication device, such as a modem," separate external modems are not covered by the asserted claims. The *Vitronics* and *Globetrotter* cases cited by PHT (Br. 11) are not to the contrary. The Federal Circut has made clear that, as here, the preferred embodiment can be disclaimed during prosecution. *Elekta Instrument S.A.* v. *O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302, 1308 (Fed. Cir. 2000) (adopting claim construction that would "exclude the preferred and only embodiment") (citing *Vitronics Corp.* v. *Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996)).

For the remaining claim terms that PHT and the defendants agree should be construed, PHT's constructions should be rejected. PHT ignores limitations that appear in the claims and incorporates limitations that do not.

Finally, the Court should decline PHT's request to construe wholesale all remaining limitations of the asserted claims. PHT makes no showing of why the plain language of these limitations is inadequate, and never offers any basis for its proposed constructions. The Court should adhere to the plain language of the claims, as defendants propose. There is no need to construe every limitation of every asserted claim.

---

[1]     "Br. __" refers to page __ of PHT's opening claim construction brief (D.I. 34).

III.    **ARGUMENT**

A.    **An External Modem Was Disclaimed During Prosecution**

The fundamental claim construction issue for five of the ten disputed terms is whether the asserted claims cover using an external modem to transmit data between the health tracker and the remote database. PHT wrongly asserts that they do:

- "Claim 22 does not exclude the possibility of an intervening device, such as an external modem, between the health tracker and the database" (Br. 10).

- "Nothing in the prosecution history excludes a system using an external modem, together with an on-board communication device such as a telecommunications driver, from the scope of the claims" (Br. 12)

During prosecution, however, applicants distinguished the prior art on the grounds that the claimed handheld unit provides "direct access" to a communications network "without requiring connection via a separate unit." This "direct access" is achieved by "a single, unified handheld unit that includes an on-board communication device, such as a modem":

> In contrast to Fang, the present invention includes a handheld monitor unit that allows it to be easily carried with a subject. A particularly useful feature in this regard is the construction of the monitor to allow direct access to a communications network without requiring connection via a separate unit, such as a personal computer. That is, the monitor is a single, unified handheld unit that includes an on-board communication device, such as a modem. Through this communication device, the handheld unit may be coupled directly to a communication network to allow direct transmission of collected data to a destination site. For example, the handheld unit may have a modem that is simply plugged into a telephone jack. The user, by pressing a single send button, then invokes the transmission protocol of the unit, which includes dialing the number of the destination site, establishing a connection and transmitting the data. There is no need for connecting the device to a computer or otherwise transmitting the data via a secondary control unit.

(Joint App. Ex. C at PHT 485). As the highlighted sentences make plain, the handheld device must have everything on-board that it needs to access the network, without the need

for a "separate unit" between the handheld device and the network.[2]  That is, the handheld device must be a self-contained unit that includes an on-board communication device, such as a modem, that can access the network.

Despite this clear disclaimer, PHT asserts that an external "dumb" modem can be used between the handheld device and the network, so long as there is a "telecommunications driver" on-board the device (Br. 11-12).  PHT's argument defies the prosecution history.  A handheld device that includes a driver, but still needs an external modem to communicate with the network, by definition needs a separate unit (the external modem) between the handheld device and the network.  Without it, the driver is incapable of accessing the network.  External modems thus are outside the scope of the asserted claims.

PHT attempts to avoid this clear disclaimer by rewriting the prosecution history:

## PHT's Rewrite of the Prosecution History

In contrast to Fang, the present invention includes a handheld monitor unit that allows it to be easily carried with a subject.  A particularly useful feature in this regard is the construction of the monitor to allow direct access to a communications network without requiring connection via a ~~separate unit (such as a personal computer~~.  That is, the monitor is a single, unified handheld unit that includes ~~an on-board communication device, such as a modem~~.  Through this communication device, the handheld unit may be coupled directly to a communication network to allow direct transmission of collected data to a destination site.  For example, the handheld unit may have a modem that is simply plugged into a telephone jack.  The user, by pressing a single send button, then invokes the transmission protocol of the unit, which includes dialing the number of the destination site, establishing a connection and transmitting the data.  There is no need for connecting the device to a computer or otherwise transmitting the data via a secondary control unit.

[handwritten annotation: secondary control unit]

[handwritten annotation: telecommunications driver]

---

[2]    The prosecution history does not say that a computer is the only kind of "separate unit" that is prohibited.  Rather, the words "***such as*** a personal computer" make plain that a computer is merely an example of a prohibited "separate unit."

PHT's rewrite is apparent from its brief, where PHT represents to the Court:

- "Applicants further explained that the patented invention excludes *a 'secondary control unit,' such as a personal computer* located between the handheld unit and the communication network." (Br. 11)

- "Applicants also explained that the handheld unit must have *an on-board communication device, such as a telecommunications driver,* that 'invokes the transmission protocol of the unit, which includes dialing the number of the destination site, establishing a connection and transmitting the data.'" (Br. 11-12)

There is no basis for these representations in PHT's brief. The prosecution history, patent specification, and claims never refer to a "telecommunications driver." Those words were coined by PHT's lawyers in this lawsuit. Similarly, the "secondary control unit" is merely an *example* of the disclaimed "separate unit" (a "computer" is another example). This is plain from the last three sentences of the above prosecution history excerpt:

> destination site. For example, the handheld unit may have a modem that is simply plugged into a telephone jack. The user, by pressing a single send button, then invokes the transmission protocol of the unit, which includes dialing the number of the destination site, establishing a connection and transmitting the data. There is no need for connecting the device to a computer or otherwise transmitting the data via a secondary control unit.

Because an external modem plainly is a separate unit, PHT's brief is careful never to mention the disclaimed "separate unit." Instead, PHT attempts to narrow the scope of its disclaimer by focusing on the specific examples that appear in the prosecution history – the "secondary control unit" (in its brief) and the "computer" (in its brief and in its proposed construction).

But even the rewrite illustrated above ("secondary control unit" for "separate unit" and "telecommunications driver" for "modem") does not carry the day for PHT. PHT goes further, rewriting examples in the prosecution history as well:

## PHT's Rewrite of the Prosecution History Examples

onboard
communications
device

destination site.  For example, the ~~handheld unit~~ ~~may have a modem~~ that is

simply plugged into a telephone jack.  The ~~~~

~~ invokes the transmission protocol of the unit, which includes dialing~~

~~the number of the destination site, establishing a connection and transmitting the~~

~~data.~~  There is no need for connecting the device to a computer or otherwise

transmitting the data via a secondary control unit.

telecom-
munications
driver

As with PHT's other rewrites, these come straight out of PHT's brief:

- "[A]ccording to the applicants, such an ***onboard communications device*** ... '*may have [such] a modem*.'"  (Br. 12; bracketed text added by PHT)

- "Applicants also explained that the handheld unit must have an on-board communication device, such as a ***telecommunications driver, that 'invokes the transmission protocol of the unit, which includes dialing the number of the destination site, establishing a connection and transmitting the data.'***" (Br. 11-12)

And there is no basis for them.

PHT's final attempt to avoid the prosecution history disclaimer is to argue

that it is improper to exclude the preferred embodiment (Br. 11).  Although it may be

uncommon for the preferred embodiment to be disclaimed during prosecution, that is exactly

what happened here.  Confronted with the prior art Fang reference, the applicants narrowed

their claims by adding various limitations, and argued extensively that their claimed device is

different from Fang because it has an "on-board communications device" that obviates the

need for a "separate unit" to access the communications network.  As a result, the issued

claims cover an alternate embodiment (internal modem), not the preferred embodiment

(external modem) (*see* illustration at p. 10 of defendants' opening brief).

The Federal Circuit has recognized that the proper claim construction may

well exclude the preferred embodiment.  "Claims that have been narrowed in order to obtain

issuance over the prior art cannot later be interpreted to cover that which was previously

disclaimed during prosecution," even if the resulting construction "exclude[s] the preferred and only embodiment disclosed in the specification." *Elekta Instrument,* 214 F.3d at 1308 (reversing summary judgment of infringement) (citing *Vitronics Corp.*, 90 F.3d at 1583).

PHT's prosecution history disclaimer impacts the claim terms discussed in Sections III.B.2, 3, 5, 9, and 10 *infra.* Accordingly, PHT's proposed constructions of those terms should be rejected as discussed herein.

**B.    PHT's Proposed Claim Constructions Are Incorrect**

**1.    "Subjective Data"[3]**

PHT's proposed construction of "subjective data" ignores the explicit definition of the term that appears in the specification:

> *[T]he term "subjective" data will refer to* data which is input by the patient to the data logger 106, regardless of whether that data pertains to the patient or the patient's environment, and whether or not the information is objective or factual, such as medication dosage or consumption of a particular food.

(col. 5:40-45).    Despite acknowledging that the patentees acted as lexicographers in providing this definition (Br. 7), PHT asserts that using it would improperly read a limitation from the specification into the claims (*Id.* at 8).

When a patentee defines a term in the specification, as here, that definition should be used to construe the claim. *See Abbott Labs.* v. *Novopharm Ltd.*, 323 F.3d 1324, 1330 (Fed. Cir. 2003).  CRF's and invivodata's proposed construction of "subjective data" should be adopted because it is identical to the definition appearing in the specification (with the word "subject" substituted for "patient" to track the nomenclature of the asserted claims).

PHT's proposed construction is also flawed because it imports limitations appearing elsewhere in the claim into the term "subjective data."  CRF and invivodata do not

---

[3]    eTrials does not believe it is necessary to construe this claim term.

7

dispute that both claims 22 and 34 require that the recorded subjective data is "regarding the subject's physiological condition and subjectively observed physiological condition." But since that limitation already appears in those claims, it should not be read into the term "subjective data."

### 2.    "Data Transmission Device Capable of Connecting Directly to a Communication Network"

PHT's proposed construction for this claim limitation should be rejected because it attempts to cover the use of an external modem, which was disclaimed during prosecution. For the reasons discussed in § III.A, *supra*, the express claim language requires a "direct" connection and the prosecution history makes clear that, for a connection to be direct, there cannot be a separate unit between the handheld tracker and the network.

An external modem, such as those used in defendants' devices, plainly qualifies as a separate unit and therefore is outside the scope of the claims. PHT's attempt to rewrite the prosecution history to recapture disclaimed scope should be rejected.

### 3.    "Single, Unified, Portable Unit"

PHT wrongly argues that this limitation should be construed as "wherein the health tracker's components are combined into a unit which is capable of being carried by a patient" (Br. 13). In PHT's view, "when a data logger is slipped into a cradle modem, the combined unit is a single, unified portable unit" (*Id.*). PHT's construction is motivated not by the intrinsic evidence of the patent, but by its desperation to recapture the external modem that was disclaimed during prosecution.

PHT's construction renders meaningless the "single, unified" claim limitation. In PHT's example, the data logger is physically separate from the cradle modem (the data transmission device). They are not two components of a single, unified portable unit and, therefore, cannot satisfy the claim limitation. If the '985 applicants had wanted to

8

cover components *capable of* being combined into a single, unified portable unit, they could have drafted their claim accordingly, *e.g.*, "wherein the health tracker's components are capable of being combined into a portable unit ...." But they did not, despite having done so in other parts of the same claim ("capable of connecting directly") and in other claims (*e.g.*, claim 39: "a modem that is connectable directly ...").

Not only are the health tracker and cradle in PHT's example not a single unified unit, but the two pieces together are not a "portable unit" as the claim requires. An ambulatory patient, to whom the claim is directed, does not carry the cradle modem around with the health tracker. It is the health tracker alone that constitutes the portable unit.[4]

PHT's claim construction gymnastics ultimately cannot overcome the plain language of the claims and the prosecution history, both of which make clear that the claimed health tracker is a single, self-contained portable unit that includes a data transmission device – not two physically separate units that can be "combined."

### 4.    "Digitized Representation of Writing"

PHT's proposed construction of the "digitized representation of ... writing" terms in claims 29 and 30 ignores an explicit requirement of the claims and injects an extraneous limitation in its place. Both claims require the device to detect a subject's *handwriting*. PHT's construction, on the other hand, permits the detection of *any pattern*

---

[4]    PHT tries to avoid this problem (that the health tracker and cradle modem are not a single portable unit) by variously defining portable to mean anything "small enough to carry" (its proposed construction for "portable" in claim 22), "small enough for a patient to carry" (for claim 34), and "capable of being carried by a patient" (in its brief at Br. 13). PHT asks the Court to adopt these broad definitions of "portable" to avoid the fact that only the health tracker is carried by a patient.

Indeed, there would be no need to "slip" the health tracker "into a cradle modem," as PHT describes (Br. 13), if the two units were carried around together as a single unit.

entered by a user (*e.g.*, by using a stylus to touch an LCD screen displaying an image of the subject's body) (Br. 14).  PHT is incorrect.

The specification distinguishes repeatedly between the subject's handwriting and other tactile input that may be provided using the pen or stylus (*see* pp. 31-32 of defendants' opening brief).  Moreover, the only two paragraphs of the patent that refer to "writing" or "write" are directed to handwriting, not some other input (col. 26:44-55 and 26:66-27:5).  And reference numerals 250 and 252 in Fig. 20A depict a subject's handwriting.

PHT criticizes the defendants for improperly limiting the claims to just the preferred embodiment (Br. 15).  PHT is incorrect.  The defendants are not reading in the preferred embodiment.  The claims were drafted that way.

The patent describes two embodiments, a preferred embodiment in which the message is transmitted as a bit-map of the patient's handwriting, and an alternate embodiment in which it is converted into characters (col. 26:44-55).  Because claims 29 and 30 are directed to a "digitized representation of ... *writing*," they cover the preferred embodiment, not the alternate embodiment.  The claims could have been written to cover both embodiments, but the applicants chose not to.  PHT cannot now, during litigation, improperly broaden the claim.

### 5.     "Data Transmission Device of the Portable Unit"

Relying on its discussion for claim 22 (Br. 17), PHT agrees that claim 34 implicitly incorporates the limitations contained in claim 22 (Br. 16-17).  The parties thus agree that the Court's determination whether an external modem was disclaimed in claim 22 controls here.  The parties disagree, however, whether a separate external modem was disclaimed during prosecution.

For the reasons discussed at pp. 24-25 of defendants' opening brief and in § B.3 *supra*, an external modem was disclaimed. The claimed data logger, time base, and data transmission device are all part of (*i.e.*, included within) the portable unit. Moreover, based on PHT's acknowledgment that claim 34 implicitly incorporates the "connecting directly" limitation of claim 22, the arguments set forth in § III.A *supra* apply as well, further confirming that the claimed "data transmission device" must be included within the handheld unit and thus cannot be an external modem.

PHT's construction incorrectly transforms the term "*a data transmission device of* the portable unit" into "*a component enabling connection of* the portable unit." By inserting the term "enabling connection," PHT separates the transmission device "component" from the portable unit. But the patent refers to a "data transmission device of the portable unit," not some separate component which enables connection of the portable unit. PHT's forced construction again underscores the extent to which it needs to rewrite the claims to have them cover a separate external modem.

Finally, PHT's brief never explains why the phrase "transmits" should be changed to "permits the transmission or,"or why the word "site" should be injected into the claim. For the reasons set forth at pp. 25-26 of defendants' opening brief, all of PHT's rewrites of this claim limitation should be rejected.

### 6.    "Digital Data Network"

PHT attacks the defendants' proposed construction on the grounds that it "excludes a telephone network from the definition of a 'digital data network'" (Br. 18). According to PHT, its construction should be adopted because "[t]elephone networks can be digital data networks" (*Id.*). PHT is wrong.

11

Notwithstanding PHT's technology tutorial purporting to describe how networks operate (Br. 18), the intrinsic evidence is overwhelming that telephone networks and digital data networks are two different things within the meaning of the '985 patent.

The intrinsic proof begins with PHT's own evidence. The portion of the specification PHT relies on to argue that the patent "describes transmitting information ... using *various types of networks*" (Br. 18) expressly distinguishes between a telephone network and the "alternative," a data network:

> Preferably, the data link from each of the health trackers 108 and each of the data loggers 106 to the database is established using an associated modem 110, *and some combination of a telephone network and a data network*. In the present embodiment, the modem 110 directly connects *via telephone* to one of the computers that support the database 102. *In the alternative*, the modem may connect to a local network access computer and *transmit data to the database via the network connection*.

(col. 5: 22-30). If a data network could include a telephone network, as PHT urges, there would be no need for the applicants to describe the use of a "combination of a telephone network and data network."

Likewise, the '985 patent claims distinguish between the two types of networks. As explained at p. 28 of defendants' opening brief, claims 46 and 47 make clear that a digital data network and a telephone network are two different things, and further that both are subsets of the broader term "communication network." Under principles of claim differentiation, "[w]here claims use different terms, those differences are presumed to reflect a difference in the scope of the claims." *Forest Labs., Inc. v. Abbott Labs.*, 239 F.3d 1305, 1310 (Fed. Cir. 2001) (citation omitted).

Finally, as explained at p. 29 of defendants' opening brief, the applicants argued patentability by noting that claim 34 is limited to a "digital data network" rather than the broader "communication network" recited in claim 1. If PHT's construction were adopted (so that the claimed digital data network could include a telephone network), the

"digital data network" of claim 34 would be no different than the "communication network" of claims 1 and 22. That cannot be.

### 7. "Public Data Network"[5]

The parties agree that the "public data network" of claim 36 is a subset of the "digital data network" of claim 34. The only dispute is whether they exclude telephone networks. For the reasons discussed in the preceding section, a data network does exclude a telephone network in view of the intrinsic evidence. Accordingly, "public data network" also excludes a telephone network.[6]

### 8. "Connection Device"

Claim 38 requires that the data transmission device of claim 34 must comprise "a connection device that facilitates connection to the data network." As discussed in defendants' Opening Brief at pp. 34-35, a modem and a data transfer device are two examples of the claimed connection device. Defendants' proposed construction thus refers to a modem and a data transfer device as *non-limiting* examples of a connection device.

As with most of its other constructions, however, PHT wants a broader scope for its claims than the intrinsic evidence warrants. According to PHT, the claimed "connection device" could be a "port associated with the telecommunications driver to connect to and control an external modem or data transfer device" – but it need not be. It

---

[5]    eTrials does not believe it is necessary to construe this claim term once "digital data network" in claim 34 is properly construed.

[6]    As explained at p. 29 n.13 of the defendants' opening brief, there is no need to construe the word "via" in claim 34. But should the Court be inclined to do so, PHT's construction is incorrect in yet another respect. It erroneously requires only some "portion" of the transmission path to the data storage location to be public, not necessarily the "digital data network" portion of that path. This contradicts the plain language of, and inappropriately broadens, the claim.

could be a single device that connects to the data network and transfers data to the database –
but it need not be.  It could be combined into a single device together with the device that
transfers data to the database – but it need not be.  (Br. 20.)

PHT thus wants a construction that is vague enough to cover
telecommunication drivers and ports (things which are never mentioned in the patent or
prosecution history), but that does not refer to modems and data transfer devices (the two
examples of connection devices that are found in the intrinsic evidence cited by the parties).
Preserving the plaintiff's ability to map a claim limitation onto whatever component of the
accused devices it chooses is not a legitimate goal of claim construction, and PHT's proposal
should be rejected.

### 9.    "Modem that is Connectable Directly to a Public Telephone Network"

Claims 39 and 40 require that the connection device of claim 38 be
connectable directly to a network.  PHT agrees with the defendants that the term
"connectable directly" should be given the same construction as the term "capable of
connecting directly" in claim 22 (Br. 20 n.11).

Inexplicably, however, PHT contends:

> ***The applicants did not place further limitations on the term
> "directly,"*** which should be construed in accordance with its ordinary
> meaning.  No additional limitations to the term "directly," ***such as the
> prohibition of a separate unit*** between the connection device and the
> network, should be added.

(Br. 21 for claim 39; *see also* Br. 22 for claim 40).  This flies in the face of the prosecution
history, which clearly defines direct access to a network as access that does not require
connection "via a separate unit" (*see* § III.A *supra*).

In the one instance where PHT relies on the prosecution history, that reliance
is misplaced.  In particular, PHT points to a sentence in the prosecution history which reads:

"For example, the handheld unit may have a modem that is simply plugged into a telephone jack" (PHT 485).   PHT argues that this sentence "implies the existence of a separate unit between the modem and the telephone jack, such as a cable with the appropriate connectors" (Br. 21).  PHT is wrong.

The prosecution history makes clear that using a cable to plug a modem into a telephone jack is an example of connecting directly to a communication network.  As a result, the cable cannot be an example of a prohibited "separate unit" that would render the connection to be indirect.

### 10.    "Connectable Directly to a Local Data Network Access Connection"

As with claim 39, PHT argues that "[n]o additional limitations to the term 'directly,' such as the prohibition of a separate unit between the connection device and the network, should be added."  For the reasons discussed above for claim 39, PHT's construction of claim 40 should be rejected.

### C.    PHT Never Explains Why Or How The Remaining Claim Terms Should Be Construed

In addition to proposing constructions for the ten disputed claim terms discussed above, PHT asks the Court to summarily adopt PHT's rewrite of all of the remaining limitations of the asserted claims (Br. 7).  PHT never explains why these limitations need to be construed.  Nor does PHT explain why its proposed constructions are correct in view of the intrinsic (or any other) evidence.  PHT merely argues that they should be adopted because defendants do not offer competing constructions.

Defendants do not offer constructions for these terms because there is no need to depart from their plain language.  The plain language is as understandable now as it was when the '985 applicants drafted it and when the Patent Office considered and allowed it.

For example, substituting the phrase "permit transmission" for the claim phrase "allow transmission" in claim 22 amounts to a wasteful exercise for the Court and the parties that does nothing to assist the jury.

Indeed, in a somewhat ambiguous sentence of its brief, PHT appears to acknowledge that "no construction of the terms is necessary" (Br. 7). Where both parties agree that no construction of these terms is necessary – and where PHT has failed to offer any evidence or argument supporting its proposed constructions – the Court should not disturb the plain language of the claims. PHT's litigation-inspired redrafting of the claim language should be rejected.

## IV.     CONCLUSION

For the reasons set forth above and in defendants' opening brief, the Court should adopt defendants' proposed claim constructions and reject PHT's proposed constructions.

MORRIS, NICHOLS, ARSHT & TUNNELL

*/s/ Julia Heaney*
Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 N. Market Street
Wilmington, DE 19801
(302) 658-3989
jheaney@mnat.com
*Attorneys for Defendant eTrials Worldwide, Inc.*

*Of Counsel*:
Laurence S. Rogers
Avinash S. Lele
Brian P. Biddinger
ROPES & GRAY LLP
1251 Avenue of the Americas
New York, NY 10020
(212) 596-9000
*Attorneys for eTrials Worldwide, Inc.*

POTTER, ANDERSON & CORROON LLP

*/s/ David E. Moore*
Richard L. Horwitz (#2246)
David E. Moore (#3983)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19899
(302) 984-6000
dmoore@potteranderson.com
*Attorneys for Defendants invivodata, Inc. and CRF, Inc.*

*Of Counsel*:
Cecilia H. Gonzalez
Brian Rosenthal
HOWREY SIMON ARNOLD & WHITE
1299 Pennsylvania Ave.
Washington, D.C. 20004
*Attorneys for invivodata, Inc.*

*Of Counsel*:
Victor H. Polk, Jr.
Lawrence T. Stanley, Jr.
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110
(617) 951-8000
*Attorneys for CRF, Inc*

458476

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on April 1, 2005, I electronically filed Defendants' Opening *Markman* Brief with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

> Josy W. Ingersoll (#1088)
> Kevin M. Baird (#4219)
> The Brandywine Building
> 1000 West Street, 17th Floor
> P.O. Box 391
> Wilmington, DE  19899
> jingersoll@ycst.com
>
> Richard L. Horwitz (#2246)
> Potter Anderson & Corroon LLP
> 1313 N. Market Street
> Wilmington, DE  19801
> rhorwitz@potteranderson.com

and I, the undersigned, also hereby certify that on April 1, 2005, I sent by Federal Express, the above-stated document to:

> Anthony Herman
> Covington & Burling
> 1201 Pennsylvania Avenue
> Washington, DC 20004-2401

> MORRIS, NICHOLS, ARSHT & TUNNELL
> /s/ *Julia Heaney*
> _____
> Jack B. Blumenfeld (#1014)
> Julia Heaney (#3052)
> 1201 North Market Street
> P.O. Box 1347
> Wilmington, Delaware 19899
> (302) 658-9200
> Attorneys for Defendant eTrials Worldwide, Inc.
> jheaney@mnat.com